————————————————————————— x

Marisol Baez, individually on behalf of herself and :
all others similarly situated, :

:          Case No.

                    Plaintiff, :

:

v. :

:

The Clorox Company and The Burt's Bees Products :    **CLASS ACTION COMPLAINT**
Company, :

:                          **JURY TRIAL DEMANDED**

                    Defendants. :

:

:

————————————————————————— x

        Plaintiff Marisol Baez (hereinafter the "Plaintiff"), individually and on behalf herself and all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

    1.    This action seeks to remedy the deceptive and misleading business practices of The Clorox Company and The Burt's Bees Products Company (hereinafter collectively "Defendants") with respect to the marketing and sale of Defendants' mascara line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Burt's Bees All Aflutter Mascara;

- Burt's Bees Nourishing Mascara: and

- Burt's Bees Lip Shimmer.

    2.    Defendants do specifically list both the active and inactive ingredients of these Products but fail to disclose that the Products contain Per and Polyfluoroalkyl Substances (hereinafter "PFAS").

3.      PFAS are a widely recognized group of man-made synthetic chemicals that are made up of incredibly dangerous substances, especially in the context of applying them to the skin. PFAS offers no therapeutic cosmetic benefit whatsoever.  Rather, PFAS are harmful toxins.

4.      PFAS have been recognized, acknowledged, and accepted as well-known health hazards to humans, the environment, and animals for decades, dating back to the 1950's.[1]

5.      To that effect, PFAS can be toxic to humans and have adverse effects on humans' bodies when they bioaccumulate, even at very low levels.

6.      PFAS can bioaccumulate in the body through mere application to the skin and by absorption through tear ducts; ingestion is not required.  Thus, PFAS exposure risk is particularly high when PFAS are applied near a person's eyes through mascara products, such as Defendants' Products, because the application subjects the user to PFAS exposure through skin and tear duct absorption.

7.      Once PFAS do bioaccumulate in the human body, PFAS are known to cause cancer, liver damage, decreased fertility, increased risk of asthma, and thyroid disease.[2]

8.      For example, "[i]n a series of five reports the [C-8 Science] panel noted a "Probable Link" between exposure to C8 [Perfluorooctanoic Acid (PFOA) which is a PFAS] and pregnancy-induced hypertension, thyroid disease, ulcerative colitis, testicular cancer, kidney cancer and high cholesterol"[3]

9.      Moreover, under the U.S. Environmental Protection Agency's (hereinafter "EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFAS in humans.[4]

---

[1] https://www.ewg.org/research/decades-polluters-knew-pfas-chemicals-were-dangerous-hid-risks-public
[2] https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-grandjean/
[3] *See*  https://odh.ohio.gov/wps/wcm/connect/gov/c7ed2904-c1ca-43bc-ae3b-5315d35fd71d/C8community.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-c7ed2904-c1ca-43bc-ae3b-5315d35fd71d-mjNdjuE
[4] U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_finalplain. Pdf.  Perfluorooctane sulfonic acid ("PFOS") is also considered a PFAS chemical.

detail below, since the carbon-fluorine bonds in PFAS are extremely strong and therefore are not degradable in environmental conditions.[5]  Consequently, the continued use of PFAS, is, by their essence, unstainable as PFAS consumption will naturally lead to a great concentration of PFAS in the environment.

11.     However, Defendants' website and the Products packaging claim that the Products are "consciously crafted with ingredients from nature," are all "over 95% natural origin," and formulated without "chemicals of concern." [6]  Further, Defendants represent that their Products are "KIND TO SKIN & PLANET SINCE 1984."[7]

12.     Despite the widespread knowledge of the dangers of PFAS, which is highlighted above and delved into greater below, Defendants still did not include on the Products' packaging or ingredients lists that the Products contain (or even risk containing) PFAS.  As such, Defendants acted negligently and/or intentionally to deceive consumers, including Plaintiff and those similarly situated (hereinafter "Class Members"), through their misleading omissions on the Products' packaging and ingredients lists.

13.     Only Defendants had exclusive knowledge of the contents and formula of their Products, including whether they contained or were at a risk of containing PFAS.

14.     Defendants, as described in greater detail below, also had exclusive knowledge of their ingredient suppliers and could have obtained information from their suppliers about the contents of the ingredients, including whether the Products contained or were at risk of containing PFAS.

15.     Nevertheless, despite Defendants knowing of the presence and/or material risk of containing PFAS in the Products, Defendants still omitted PFAS from the ingredients list.

---

[5] https://www.marylandmatters.org/2022/05/03/maryland-pirg-whats-next-for-toxic-forever-chemicals/.
[6] https://www.burtsbees.com/values/.
[7] https://www.burtsbees.com/product/all-aflutter-multi-benefit-mascara/VM-792850903340.html.

16.     Consumers like Plaintiff trust manufacturers such as Defendants to sell Products that accurately inform consumers what is in the Products, including whether they contain or risk containing known toxins and carcinogens such as PFAS.

17.     Moreover, consumers like Plaintiff and Class Members are unable to determine nor identify the contents of the Products and decipher whether they are at risk of the dangers presented by PFAS at the point of sale due to the Products' omission and failure to disclose the presence or risking of containing PFAS on the packaging and/or ingredient lists.

18.     As such, Plaintiff and Class Members certainly expect that the mascara cosmetic products they purchase will comply with their labeling and not contain any knowingly harmful substance or carcinogen like PFAS.

19.     Defendants specifically manufacture, sell, and distribute the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

20.     For example, Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product—the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products and to warn of any potential health effects from the ingredients.

21.     However, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain PFAS, which Defendants do not list nor mention anywhere on the Products' packaging or labeling.

22.     Plaintiff and Class Members relied on Defendants' misrepresentations and omissions of what is in the Products when they purchased them.

4

23.     Consequently, Plaintiff and Class Members lost the entire benefit of their bargain when what they received was a mascara product contaminated with known harmful toxins. Alternatively, Plaintiff paid a premium for Products that were not as they were represented to be.[8]

24.     Accordingly, Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350.  Defendants also breached and continue to breach their warranties regarding the Products.  In addition, Defendants have been and continue to be unjustly enriched.

25.     Plaintiff brings this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## **FACTUAL BACKGROUND**

**Defendants' Misleading Advertising and Marketing Campaign for the Products**

26.     Defendant, The Clorox Company, is a conglomerate and major manufacturer of household products.  Defendant, The Burt's Bees Products Company, is a wholly owned subsidiary of The Clorox Company and sells popular cosmetic products, including mascara products, including the Products at issue.  Defendants sell the Products through the Burt's Bees Products Company website, third-party retail stores, and online sellers.

27.     By way of background, The Clorox Company purchased Burt's Bees Products Company in late 2007.[9]  Defendant The Clorox Company claims on its website that, "[b]y

---

[8] By way of example and to plausibly plead that a price premium exists in this case, Burt's Bees All Aflutter Mascara for approximately $13.00 per tube. *See* https://www.burtsbees.com/product/all-aflutter-multi-benefit-mascara/VM-792850903340.html.  However, there are much cheaper similar products available.  For example, Neutrogena's "Healthy Volume Mascara," only costs $7.49. https://www.target.com/p/neutrogena-healthy-volume-mascara-02-black-0-21oz/-/A-10760203?ref=tgt_adv_XS000000&AFID=google_pla_df&fndsrc=tmnv&DFA=71700000090468522&CPNG=PLA_DVM%2Ba064R000012L0RHQA0-J%26J_NTG_COS_J3+Search_Google+Search_Seasonal_Flight-594294&adgroup=PLA_J%26J_NTG_COS&LID=700000001393753pgs&network=g&device=c&location=9004077&gclid=Cj0KCQjwspKUBhCvARIsAB2IYuusslO-soPvvs2kgqmiTm8th1P1Jt3w_y49qaQ5ISvjsTrnolzeY70aAvGIEALw_wcB&gclsrc=aw.ds.
[9] https://investors.thecloroxcompany.com/investors/news-and-events/press-releases/press-release-details/2007/Clorox-to-Acquire-Burts-Bees-Expands-Into-Fast-Growing-Natural-Personal-Care/default.aspx

supporting science-backed research to inform public health practices, we believe we can help to create a cleaner and safer future where we can all thrive."[10]

28.     Since The Clorox Company's acquisition of Burt's Bees Products Company, Defendants together have gained the trust of consumers, like the Plaintiff, who reasonably believed that Defendants' products, including the harmful Products at issue, are made with safe, high-quality materials, and can be used safely as intended.  However, the Products are not safe for use since they contain harmful PFAS.  Moreover, as delved intro in greater detail below, independent testing conducted by *Mamavation*, a "green" product investigation organization and network, found that the Products contain high levels of PFAS, which includes some of the highest levels of all cosmetic products tested.

29.     This is directly contrary to the Defendants' representations regarding the Products. For example, Defendants' claim that it produces products that are, "KIND TO SKIN & PLANET SINCE 1984," with additional health and nature conscious representations as depicted below:

---

[10] https://www.clorox.com/our-purpose/public-spaces/



30.     Moreover, Defendants claim that their products, including the Products at issue, are "consciously crafted with ingredients from nature to nourish and revitalize your skin.  We select nutrient-rich ingredients to help support a strong and healthy skin barrier.  We strive for 100% natural origin formulas, and all of our products are over 95% natural origin.  *We formulate without phthalates, parabens, petrolatum, sodium lauryl sulfate (SLS) and other chemicals of concern."*[11] (emphasis added).

31.     Defendants both built their strong reputation and consumer trust by manufacturing and selling household and cosmetic products that are supposed to be reliable and of high quality, which has also led to billions in annual revenue.

32.     Nevertheless, despite Defendants gained trust with consumers and aforementioned health-conscious claims regarding their products and the Products at issue, nowhere on either of Defendants' websites or on the Products' labeling is it mentioned that the Products are unsafe, unsustainable, or that PFAS are dangerous to humans and the environment.

---

[11] https://www.burtsbees.com/values/.

environment because they know it will negatively impact their reputation and sales. This is even more so true in the rapidly growing "clean beauty" market where companies like Defendants have taken advantage of consumer demand for more health-conscious products with false or misrepresenting representations regarding their products. Unfortunately for consumers, like Plaintiff and Class Members, in reality, the Products contain high levels of organic fluorine, an indicator of PFAS, which are not beneficial to health or the environment.

34. Accordingly, Defendants' misrepresentations about the presence of and importance of environmentally damaging and unhealthy chemicals, PFAS, in the Products is solely driven by Defendants' desire to maximize sales revenue.

35. Defendants' marketing campaign, which includes representations such as, "KIND TO SKIN & PLANET,"[12] "consciously crafted with ingredients from nature,"[13] and "[c]onsciously [m]ade [s]ince 1984 [c]lean, effective formulas made with care from the #1 Dermatologist Recommended Natural Skincare Brand,"[14] deceived and/or is likely to deceive the public. Consumers, including Plaintiff and Class Members, have been, and continue to be, deceived into believing that the Products are free from toxic chemicals and sustainable, when, in fact, the Products contain harmful PFAS that are unhealthy for both humans and the environment.

36. Defendants know that a reasonable consumer would not have purchased or paid a premium price for the Products if the consumer knew that the Products contain harmful toxins, like PFAS, and their known adverse health effects. Defendants also knew that the Products were manufactured with PFAS but chose to mispresent this material information in an attempt to make consumers believe they are in indeed purchasing Products that are safe, rather than Products containing potentially harmful chemicals.

---

[12] https://www.burtsbees.com/product/all-aflutter-multi-benefit-mascara/VM-792850903340.html.
[13] https://www.burtsbees.com/values/.
[14] https://www.burtsbees.com/.

37. Defendants do not disclose on their websites, ingredients list, packaging, or in any

other manner, that the Products contain PFAS. However, as described in further detail below, independent testing conducted by *Mamavation* on the Products show high levels of PFAS in the Products.

38. Defendants' omission of PFAS in the Products are a misrepresentation that constitutes false and misleading marketing.

39. Defendants intended for consumers, such as Plaintiff and Class Members, to rely on the statements and omissions on the packaging, labeling, and ingredient lists of the Products at the time of purchase. Consequently, Defendants' omissions were designed to mislead consumers, such as Plaintiff and Class Members, when purchasing the Products. If Plaintiff had known the truth about Defendants' concealment (that their Products had or risked containing PFAS), then Plaintiff would not have purchased the Products or would have paid less for the Products.

40. Defendants own, manufacture, and distribute the Products and are responsible for allowing PFAS in the Products, for the omission of PFAS on the Products' labeling and ingredient lists, and for selecting and sourcing the ingredients used for the Products. Thus, Defendants knew, or should have known, that failing to disclose the presence of detectable levels of PFAS was a material omission and that it was concealing the true quality, nature, and safety of the Products.

41. To that effect, none of the Products disclose PFAS or risk of containing PFAS on the packaging, labeling, or ingredient lists of the Products.

42. Instead, Defendants include several misrepresentations in addition to the omissions of PFAS that would lead a reasonable consumer to conclude that the Products are safe and do not contain harmful PFAS.

43. Moreover, alternative formulation, designs, materials, and manufacturing methods were available to Defendants at the time the Products were formulated, designed and manufactured, and such alternative formulations and designs were and used by other manufacturers to produce and sell clean, natural makeup.

9

44.     For example, Neutrogena "Healthy Volume Mascara," does not make any claims regarding its impact on the environment nor make any claims regarding dermatologists' recommendations, as depicted below:



45.     Accordingly, all the aforementioned representations are likely to mislead reasonable consumers, including Plaintiff, into believing that the Products are safe for use and do not contain or risk containing the carcinogenic and/or toxic PFAS not disclosed on the Products' label, packaging, or ingredients list.

**PFAS and Mascara Products**

46.     Defendants market, advertise, and sell the mascara Products as beauty products that are used to thicken, lengthen, color, curl, and provide volume to eyelashes, with the goal of helping to accentuate the appearance of eyes.

47.     Sales of mascara products, including waterproof mascaras, have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from harmful chemicals.  As of 2020, the global mascara market size was $5.7 billion USD, and it is expected to reach 6.9 billion USD by 2027.[15]

48.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they put on and/or into their bodies.  Companies such as Defendants have capitalized on consumers' desire for healthy and safe products, and indeed consumers are willing to pay, and have paid, a premium for these products.

49.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains additional unlisted substances, including unsafe substances such as PFAS, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain on the Products' packaging or labels.

50.     When consumers look at the Products' packaging, there is no mention of PFAS.  PFAS are not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of PFAS in the Products.  This leads reasonable consumers to believe the Products do not contain dangerous chemicals like PFAS.

51.     Additionally, Defendants' website does not mention PFAS in the Products.  For example, Burt's Bees' "All Aflutter Mascara," "Nourishing Mascara," and "Lip Shimmer" Products make no mention of any contained PFAS on their respective product pages (burtsbees.com) or on the Products themselves as depicted below:

***Burt's Bees All Aflutter Mascara***

[15] https://www.marketwatch.com/press-release/mascara-market-in-2022-27-cagr-with-top-countries-data-what-are-the-growth-opportunities-in-the-mascara-industry-latest-142-pages-report-2022-01-20



Key Ingredients Zoomed In



**KEY INGREDIENTS**

Ingredients: aqua [water], cera alba [beeswax], glycerin, candelilla cera [euphorbia cerifera (candelilla) wax], stearic acid, galactoarabinan, simmondsia chinensis (jojoba) seed oil, sodium stearoyl lactylate, pullulan, hectorite, sorbitol, glyceryl caprylate, mica, glyceryl stearate, levulinic acid, coco-glucoside, p-anisic acid, xanthan gum, sodium levulinate, acacia senegal gum, potassium stearate, trehalose, stearoyl glutamic acid. May contain [+/-]: CI 774917749277499 [iron oxides]





*Burt's Bees Nourishing Mascara*



Key Ingredients Zoomed In

✕

**KEY INGREDIENTS**

Ingredients: aqua [water], cera alba [beeswax], glycerin, euphorbia cerifera cera [euphorbia cerifera (candelilla) wax], stearic acid, galactoarabinan, simmondsia chinensis (jojoba) seed oil, sodium stearoyl lactylate, pullulan, hectorite, sorbitol, acacia senegal gum, xanthan gum, coco-glucoside, mica, trehalose, p-anisic acid, glyceryl caprylate, glyceryl stearate, levulinic acid, sodium levulinate, potassium stearate, stearoyl glutamic acid. May contain [+/-]: CI 77491•CI 77492•CI 77499 [iron oxides].



*Burt's Bees Lip Shimmer*



Key Ingredients Zoom In

✕

**KEY INGREDIENTS**

Ingredients: ricinus communis (castor) seed oil, helianthus annuus (sunflower) seed oil, beeswax, euphorbia cerifera wax, mentha piperita (peppermint) oil, lanolin, theobroma cacao (cocoa) seed butter, copernicia cerifera wax, butyrospermum parkii (shea) butter, fragaria ananassa (strawberry) seed oil, prunus armeniaca apricot) kernel oil, ribes nigrum black currant) seed oil, rosmarinus officinalis (rosemary) leaf extract, sambucus nigra (elderberry) seed oil, tocopherol, canola oil, glycine soja (soybean) oil. +/-: mica, iron oxides, carmine, alumina, titanium dioxide

Cocoa Ingredients: ricinus communis (castor) seed oil, helianthus annuus (sunflower) seed oil, beeswax, euphorbia cerifera wax, mentha piperita (peppermint) oil, lanolin, theobroma cacao (cocoa) seed butter, copernicia cerifera wax, tocopherol, rosmarinus officinalis (rosemary) leaf extract, canola oil, glycine soja (soybean) oil. +/-: mica, iron oxides, carmine, alumina, titanium dioxide, tin oxide



Made with
**RESPONSIBLY SOURCED BEESWAX**
**& PEPPERMINT OIL**



52.     However, despite Defendants' representations and omissions, the Products contain PFAS.

**Danger of PFAS in Cosmetic Products**

53.     There are thousands of PFAS in existence, but what all PFAS share is that they are comprised of multiple carbon-fluorine bonds, which are considered some of the strongest in chemistry.  As such, PFAS are highly persistent in the environment, humans, and even animals.

54.     PFAS are generally defined as either "long chain" or "short chain" and vary depending on the amounts of carbon atoms contained.  Long-chain PFAS contain seven

or more carbon atoms; as opposed to short-chain PFAS, which contain seven or fewer

carbon atoms.

55.     Some of the most dangerous long-chain PFAS include, PFOA and PFOS, which have been found at high rates throughout the world in the environment, humans, and animals.

56.     Short-chain PFAS, according to a study conducted by the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds.  This means that short-term PFAS have negative impacts on the environment, humans, and animals.  The study also found that short-term PFAS can have even greater adverse effects on human organs, such as greater damage to the liver and thyroid hormone.[16]

57.     A common usage of PFAS is through the consumer product manufacturing processes to help products become resistant to water, grease, and stains; however, PFAS still contain very dangerous adverse side effects even when used in this context since the inhalation of PFAS can also lead to negative health consequences.

58.     PFAS are also extremely soluble in water, which has led to harm to humans and animals that drink PFAS contaminated water.  Moreover, PFAS solubility is also leading to the discovery of PFAS in marine life.

59.     PFAS are harmful to humans in addition to the environment and persist and bioaccumulate over time in a person, meaning they can be harmful even at very low levels due to the accumulation over time.

60.     PFAS bind to proteins in the blood of humans exposed to the material and remain and persist over long periods of time.  Due to their unique chemical structure, PFAS bioaccumulate in the blood and body of exposed individuals.

---

[16] National Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed on Apr. 20, 2022).

or in the environment, so the more they get used, the more they build up and the bigger the risk

they pose to our health.[17]

62.     Accordingly, scientists and health experts alike have become increasingly

concerned about how PFAS impact human health, and the Centers for Disease Control

and Prevention (hereinafter "CDC") outlined, "a host of health effects associated with

PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of

asthma and thyroid disease."[18]

63.     Additionally, many PFAS are associated with harmful and serious health

effects, which include altered growth, negative effect on children's cognitive abilities,

interference with the body's natural hormones, increased cholesterol levels, modulation

of the immune system, testicular and kidney cancers, high uric acid levels, elevated liver

enzymes, ulcerative colitis, and pregnancy induced hypertension.

64.     Of particular concern are cosmetics, such as the Products at issue herein,

that are applied close to the eyes and the mouth, which could increase exposure and

enhance risk due to increased absorption and ingestion.[19]

65.     PFAS in cosmetics can be directly absorbed into the human body through

tear ducts, inhalation, and ingestion by applying the cosmetic products either on the

eyelids, face, or lips.  The most common cosmetic products that result in this type of

inhalation are through mascara products, foundation, and liquid lipstick.

66.     Defendants knew, or should have known, that PFAS remain or bioaccumulate in

the human body while presenting significant health risks to humans.

---

[17] https://www.marylandmatters.org/2022/05/03/maryland-pirg-whats-next-for-toxic-forever-chemicals/.
[18] Harvard T.H. Chan Sch. of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last accessed on Apr. 20, 2022).
[19] Heather D. Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, Env't Sci. & Tech. Letters 2021, 8, 7, 538-44 June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240?goto=supporting-info (last accessed on Apr. 20, 2022).

67.     To combat the newfound risks posed by PFAS in cosmetic products, in June 2021, bi-partisan legislation was formed in the Senate and House to ban PFAS in cosmetic products, which included makeup, moisturizer, and perfume.[20]  This proposed legislation was supported by the scientific community.[21]

68.     Many domestic and world organizations have moved to ban PFAS or recognize PFAS as harmful toxins.  For example:

a.    The Stockholm Convention on Persistent Organic Pollutants listed PFOS as an organic pollutant.[22]

b.    The US government announced a "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS.  As part of the Roadmap, the EPA committed to designating PFOA as "hazardous substances" under the Comprehensive Environmental Response, Compensation and Liability Act (hereinafter "CERCLA"), finalizing a PFAS reporting rule under the Toxic Substance Control Act ("hereinafter "TSCA") section 8(e); and publishing toxicity assessment for seven popularly used PFAS.[23]

c.    The Science Advisory Board (hereinafter "SAB") stated PFOA is a "likely carcinogen," and that evidence supports a label of "likely carcinogen" for PFOS.[24]

d.    The International Agency for Research on Cancer (hereinafter "IARC") has classified PFOA as possibly carcinogenic to humans.[25]

e.    The CDC has recognized that the exposure to PFAS may impact the immune system and reduce antibody response to vaccines.

---

[20] *See* https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics; *see also* https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097

[21] *Id.*

[22] Melissa Lim, Secretariat of the Basel, Rotterdam and Stockholm Conventions, "Phasing out PFOS under the Stockholm Convention," May 2014, https://www.oecd.org/chemicalsafety/portal-perfluorinated-chemicals/webinars/Presentation%203_Melisa.pdf (last accessed on Apr. 21, 2022).

[23] EPA, United States Environmental Protection Agency, "PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024," https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024 (last accessed on Apr. 21, 2022).

[24] EPA, United States Environmental Protection Agency, "EPA Advances Science to Protect the Public from PFOA and PFOS in Drinking Water," November 16, 2021, https://www.epa.gov/newsreleases/epa-advances-science-protect-public-pfoa-and-pfos-drinking-water (last accessed on Apr. 21, 2022).

[25] IARC Monographs, "Some Chemicals Used As Solvents And In Polymer Manufacture," Volume 110, World Health Organization, 2017, file:///Users/ethanrubin/Downloads/mono110.pdf (last accessed on Apr. 25, 2022).

This is of particular concern to those that have received the COVID-19 vaccine to protect against the ongoing pandemic.[26]

Case 3:22-cv-05219-RS   Document 1   Filed 07/07/22   Page 22 of 39

69.  Even though PFAS are essentially unregulated at the federal level, over the past decade, a few states have recognized the risk posed by PFAS themselves and have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.  For example:

a.  New Jersey's Department of Environmental Protection issued a preliminary drinking water guidance for PFOA.[27]

b.  New York took steps to regulate when and how PFAS could knowingly be released into the environment, including for firefighting purposes.  New York also enacted a law that prohibits the sale of food packaging containing PFAS.[28]

c.  California passed the Toxic Free Cosmetics Act, which will prohibit the manufacturing and/or selling of any cosmetic products with any intentionally added amount of 24 specified chemicals, including PFAS.[29]  California's Office of Environmental Health Hazard Assessment (hereinafter "OEHHA") also listed PFOA as a carcinogen under proposition 65 and recently enacted legislation to remove PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware like New York's regulation.[30]

d.  Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[31]

e.  Maine, Minnesota, Vermont, and Washington have recently enacted a law that will ban PFAS in nearly all products.[32]

---

[26] ATSDR, Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances (PFAS) and Your Health," https://www.atsdr.cdc.gov/pfas/health-effects/index.html#:~:text=CDC%2FATSDR%20recognizes%20that%20exposure,resistance%20(NTP%2C%202016). (last accessed on Apr. 21, 2022).

[27] New Jersey Department of Environmental Protection, "Contaminants of Emerging Concern," https://www.nj.gov/dep/srp/emerging-contaminants/#:~:text=Perfluorooctanoic%20Acid%20(PFOA)%3A,PFOA%20of%2014%20ng%2FL.(last accessed on Apr. 21, 2022).

[28] NY Gen. Bus. L. § 391-u-2, accessible at: https://www.nysenate.gov/legislation/laws/GBS/391-U*2 (last accessed on Apr. 25, 2022); *see also* S8817/A4739.

[29] Cal. Toxic-Free Cosmetic Act (AB 2762 – Muratsuchi).

[30] OEHHA, "Notice to Interested Parties Chemical Listed Effective Feb. 25, 2022, As Known to the State of California to Cause Cancer: Perfluorooctanoic Acid," https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemical-listed-effective-february-25-2022-known-state, California Office of Environmental Health Hazard Assessment, California Office of Environmental Health Hazard Assessment (last accessed on Apr. 25, 2022); *see also* Cal. Safer Food Packaging and Cookware Act 2021, AB 1200.

[31] Public Act 21-191, *An Act Concerning the Use of PFAS Substances in Class B Firefighting B Foam*.

[32] Sec. 1.32 MRSA § 1731 5-A, *An Act To Protect the Environment and Public Health by Further Reducing Toxic Chemicals in Packaging*; *see also* Sec. 325F.075, *Food Packaging; PFAS*; *see also* S.20 (Act 36); *see also* HB 1694 – 2021-22.

70.    Regarding federal regulation, the use and labeling of cosmetic products is regulated by the Federal Food, Drug, and Cosmetics Act of 1938 and the Fair Packaging and Labeling Act of 1967.  Cosmetic products are defined as products that are "intended to be rubbed, poured, sprinkled, sprayed on, introduced into, or otherwise applied to the human body… for cleansing, beautifying, promoting, attractiveness, or altering the appearance."[33]

71.    However, except for a few color additives, the Food and Drug Administration (hereinafter "FDA") does not require cosmetics to obtain FDA approval prior to entering the market, and federal regulation does not regulate the testing needed to determine the contents and/or safety of cosmetics.[34]

72.    Consequently, the only oversight is done on a voluntary basis on the part of cosmetic companies that wish to partake in registering the brand name and ingredient of their products.

**The Usage and Testing of PFAS in Cosmetic Products**

73.    In addition to PFAS being found in lipsticks, foundations, and mascara cosmetic products, PFAS can also be found in other cosmetic products that can be absorbed through skin contact, such as lotions, cleansers, nail polish, shaving cream, eyeliner, and eyeshadow.

74.    PFAS are generally added to cosmetics to increase their long-term wearability and to make skin appear shimmery and smooth.[35]  PFAS can also increase product durability, product consistency, and water resistance.[36]

75.    In some instances, PFAS are indeed added to ingredients lists of cosmetic products, but even in such instances the amounts of PFAS contained therein is not disclosed.

---

[33] FD&C Act, sec. 201(i).
[34] https://www.fda.gov/cosmetics/voluntary-cosmetic-registration-program
[35] https://www.smithsonianmag.com/smart-news/hold-blush-cosmetics-may-contain-toxic-forever-chemicals-180978036/#:~:text=PFAS%20are%20added%20to%20cosmetics,product%20consistency%20and%20water%20resistance.
[36] *Id.*

76.     However, Defendants do not make mention of PFAS in their mascara products and

instead even include the representation on their website that their Products are, "Clean, effective formulas made with care from the #1 Dermatologist Recommended Natural Skincare Brand," as depicted below:

CONSCIOUSLY MADE SINCE 1984

Clean, effective formulas made with care from the #1 Dermatologist Recommended Natural Skincare Brand.

LEARN MORE >

 INGREDIENTS FROM NATURE  RESPONSIBLE SOURCING  LEAPING BUNNY CERTIFIED  RECYCLABLE PACKAGING  LANDFILL-FREE OPERATIONS  CARBONNEUTRAL® CERTIFIED

*Based on a September 2021 NielsenIQ national survey of U.S. Dermatologists

77.     In June 2021, Notre Dame University researchers published a peer-reviewed study ("Study") of 231 cosmetic products to determine whether the tested cosmetic products contained PFAS.  The test was conducted by utilizing a particle induced gamma ray emission to screen for total fluorine, which is the chemical indicator for PFAS in products.  Specifically, the Study tested lip products, eye products, face products, foundations, mascaras, concealers, and eyebrow products, which were purchased from retailers.[37]

78.     The Study found that mascara products produced the largest range of total fluorine measurements.  Moreover, the three product categories with the highest proportion of fluorine concentrations were foundations, mascaras, and lip products, which is of significance since those are three cosmetic products applied to the face and have easiest access to human ingestion through inhalation and absorption.

79.     Even more concerning is that researchers concluded that high fluorine levels were detected in commonly advertised "water resistant" and/or "long lasting" foundations, liquid lipsticks, and waterproof mascaras, such as Defendants' Products.

80.     A further analysis of 29 foundations, mascaras, and lip products was also conducted and revealed that short-chain PFAS were commonly found in these cosmetic products. Additionally, researchers detected long-chain PFAS in these 29 cosmetic products.

---

[37] https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240

listed any PFAS as an ingredient and only 3% of the 29 products in the second round of testing

listed any PFAS as an ingredient.

82.	The Study led the federal government to enact bipartisan legislation that would ban

PFAS in cosmetic products, including makeup, moisturizer, and perfume.  The proposed

legislation by U.S. Senator Susan Collins (R-ME) and Senator Richard Blumenthal (D-CT) also

would direct the FDA to issue a proposed rule banning the intentional addition of PFAS in

cosmetics within 270 days of the law's enactment and require a final rule to be issued 90 days

thereafter.[38]  Similar legislation was also introduced in the House of Representatives by

Representatives Debbie Dingell (D-MI), Brian Fitzpatrick (R-PA), Annie Kuster (D-NH), and

John Katko (R-NY).[39]

83.	Moreover, the Study inspired *Mamavation*, a "green" product investigation

organization and network, to conduct its own independent study to test for PFAS in beauty

products that advertise and sell as "green" products, such as products marketed as being

environmentally sustainable, eco-friendly, and generally manufactured from natural and non-toxic

materials, such as the Products.

84.	In its study, *Mamavation* tested 83 beauty products from 49 different green beauty

cosmetic brands, which included mostly mascara and lip products, and identified three exposure

levels: (a) "high exposure" - above 30 parts-per-million (ppm) of organic fluorine; (b) "medium

exposure" - between ten ppm and 29 ppm of organic fluorine; and (c) "low exposure" - below ten

ppm of organic fluorine."[40]

85.	The *Mamavation* study tested for organic fluorine, which is considered a marker

for PFAS compounds and is a method of testing used to measure PFAS in other industries as

well.[41]

---

[38]  https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics
[39] https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097
[40] https://www.mamavation.com/beauty/green-beauty-cosmetic-makeup-guide-pfas-forever-chemicals.html.
[41] https://www.epa.gov/water-research/pfas-analytical-methods-development-and-sampling-research.

organic fluorine levels found in the Products, the Products were placed on *Mamavation's*, "Not

Our Favorite Green Beauty Cosmetic Brands with High Levels of PFAS 'Forever Chemicals'"

category.[42] In particular, the organic fluorine levels for the Products were amongst the highest:

    a.    Burt's Bees All Aflutter Mascara (357 ppm organic fluorine);

    b.    Burt's Bees Nourishing Mascara (357 ppm organic fluorine); and

    c.    Burt's Bees Lip Simmer (36 ppm organic fluorine).[43]

87. Defendants' false, misleading, omissions, and deceptive misrepresentations

regarding the ingredients of the Products are likely to continue to deceive and mislead reasonable

consumers and the public, as they have already deceived and misled Plaintiff and the Class

Members.

88. Defendants' concealment was material and intentional because people are

concerned with what is in the products that they are putting onto and into their bodies. Consumers

such as Plaintiff and the Class Members are influenced by the ingredients listed. Defendants know

that if it had not omitted that the Products contained or risked containing PFAS, then Plaintiff and

the Class would not have purchased the Products or paid a premium for them.

## JURISDICTION AND VENUE

89. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28

U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members;

(2) Plaintiff Marisol Baez is a citizen of New York, Defendant The Clorox Company is a citizen

of Delaware and California, and Defendant The Burt's Bees Products Company is a citizen of

California; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and

costs.

---

[42] https://www.mamavation.com/beauty/green-beauty-cosmetic-makeup-guide-pfas-forever-chemicals.html.
[43] *Id.*

90.     This Court has personal jurisdiction over Defendants because Defendants conduct

and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

91.     Venue is proper because Defendants and many Class Members reside in the Eastern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

### Plaintiff

92.     Plaintiff Marisol Baez is a citizen and resident of the state of New York.  Plaintiff resides in Queens, New York.   During the applicable statute of limitations period, Plaintiff purchased Defendants' Burt's Bees All Aflutter Mascara Products that contained PFAS.  Plaintiff purchased Defendants' Products for her personal use during the Class Period in Queens, New York.  Plaintiff's most recent purchase was in 2022 from an online retailer for approximately $14.49.  Plaintiff purchased the Products in Queens, New York and had the Products shipped to her home in Queens, New York.  Independent testing has confirmed that these Products contained PFAS.

93.     Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the Products containing PFAS, Plaintiff would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for, the Products than she would have had they known the truth about the Products.  The Products Plaintiff received were not as represented because they contain or risked containing the known toxin PFAS. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

94.     Defendant, The Clorox Company, is a Delaware corporation with its principal place of business in Oakland, California.  The Clorox Company is one of the largest household products companies in the country.

95.     Defendant, The Burt's Bees Products Company is a wholly owned subsidiary of The Clorox Company with its primary place of business located in Oakland, California.

96.     Defendants manufacture, market, advertise, and distribute the Products throughout the United States.  Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of their Products.

## CLASS ALLEGATIONS

97.     Plaintiff bring this matter on behalf of herself and those similarly situated.  As detailed at length in this Complaint, Defendants orchestrated deceptive marketing and labeling practices.  Defendants' customers were uniformly impacted by and exposed to this misconduct.  Accordingly, this Complaint is uniquely situated for class-wide resolution.

98.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

99.     Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

100.    The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

101.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

102.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers in the Class and the New

York Class who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

103.   <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

   a.   Whether Defendants are responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

   b.   Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

   c.   Whether Defendants made false and/or misleading statements and omissions to the Class and the public concerning the contents of their Products;

   d.   Whether Defendants' false and misleading statements and omissions concerning their Products were likely to deceive the public; and

   e.   Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

104.   <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendants' Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

105.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interest does not conflict with the interests of the Class Members she seeks to represent, her consumer fraud claims are common to all members of the Class, she has a strong interest in vindicating her rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

above predominate over any other questions affecting only individual members of the Class.  The

Class issues fully predominate over any individual issues because no inquiry into individual

conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading

marketing and labeling practices.

107.   <u>Superiority</u>: A class action is superior to the other available methods for the fair

and efficient adjudication of this controversy because:

a.      The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.      The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.      When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class Members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.      It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products.

108.   Accordingly, this Class is properly brought and should be maintained as a class

action under Rule 23(b)(3) because questions of law or fact common to Class Members

superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and New York Subclass Members)**

109.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

110.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

111.    The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

112.    There is no adequate remedy at law.

113.    Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

114.    Defendants' improper consumer-oriented conduct—including failing to disclose that the Products have or risk containing PFAS—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase Defendants' Products and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

115.    Plaintiff and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

116.    Defendants' advertising and Products' packaging and labeling induced Plaintiff and

the New York Subclass Members to buy Defendants' Products.

117.    Defendants' deceptive and misleading practices constitute a deceptive act and

practice in the conduct of business in violation of New York General Business Law §349(a) and

Plaintiff and the New York Subclass Members have been damaged thereby.

118.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices,

Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory,

treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of

Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL § 350
### (On Behalf of Plaintiff and the New York Subclass Members)

119.    Plaintiff repeats and realleges each and every allegation contained in all the

foregoing paragraphs as if fully set forth herein.

120.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce
> or in the furnishing of any service in this state is hereby declared
> unlawful.

121.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or
> of the kind, character, terms or conditions of any employment
> opportunity if such advertising is misleading in a material respect.
> In determining whether any advertising is misleading, there shall be
> taken into account (among other things) not only representations
> made by statement, word, design, device, sound or any combination
> thereof, but also the extent to which the advertising fails to reveal
> facts material in the light of such representations with respect to the
> commodity or employment to which the advertising relates under
> the conditions proscribed in said advertisement, or under such
> conditions as are customary or usual . . .

122.    Defendants' labeling and advertisements contain untrue and materially misleading

statements and omissions concerning their Products inasmuch as Defendants misrepresent that the

Products are safe for use and don't list that the Products contain or risk containing PFAS.

32

123.   Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

124.   Defendants' advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

125.   Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

126.   Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

127.   Defendants made the material misrepresentations described in this Complaint in their advertising and on the Products' packaging and labeling.

128.   Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.   Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

129.   As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiff and All Class Members)**

130.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.   Defendants provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products contain what they say they contain and are safe for use.   These express affirmations include, but are not limited to,

33

Products contained or risked containing PFAS.

132.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

133.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff and Class Members' transactions.

134.    Plaintiff and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

135.    Defendants knowingly breached the express warranties by including PFAS in the Products sold to Plaintiff and the Class without properly notifying them of their inclusion or risk of inclusion in the Products.

136.    Within a reasonable time after they knew or should have known, Defendants did not change the Products' labels to include PFAS in the ingredient list.

137.    Defendants thereby breached the following state warranty laws:

    a.    Code of Ala. § 7-2-313;

    b.    Alaska Stat. § 45.02.313;

    c.    A.R.S. § 47-2313;

    d.    A.C.A. § 4-2-313;

    e.    Cal. Comm. Code § 2313;

    f.    Colo. Rev. Stat. § 4-2-313;

    g.    Conn. Gen. Stat. § 42a-2-313;

    h.    6 Del. C. § 2-313;

    i.    D.C. Code § 28:2-313;

    j.    Fla. Stat. § 672.313;

    k.    O.C.G.A. § 11-2-313;

l.  H.R.S. § 490:2-313;

m.  Idaho Code § 28-2-313;

n.  810 I.L.C.S. 5/2-313;

o.  Ind. Code § 26-1-2-313;

p.  Iowa Code § 554.2313;

q.  K.S.A. § 84-2-313;

r.  K.R.S. § 355.2-313;

s.  11 M.R.S. § 2-313;

t.  Md. Commercial Law Code Ann. § 2-313;

u.  106 Mass. Gen. Laws Ann. § 2-313;

v.  M.C.L.S. § 440.2313;

w.  Minn. Stat. § 336.2-313;

x.  Miss. Code Ann. § 75-2-313;

y.  R.S. Mo. § 400.2-313;

z.  Mont. Code Anno. § 30-2-313;

aa.  Neb. Rev. Stat. § 2-313;

bb.  Nev. Rev. Stat. Ann. § 104.2313;

cc.  R.S.A. 382-A:2-313;

dd.  N.J. Stat. Ann. § 12A:2-313;

ee.  N.M. Stat. Ann. § 55-2-313;

ff.  N.Y. U.C.C. Law § 2-313;

gg.  N.C. Gen. Stat. § 25-2-313;

hh.  N.D. Cent. Code § 41-02-30;

ii.  II. O.R.C. Ann. § 1302.26;

jj.  12A Okl. St. § 2-313;

kk.  Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.   R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.  Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

138.    As a direct and proximate result of Defendants' breach of the express warranties, Plaintiff and Class Members were damaged in the amount of the price they paid (or premium paid) for the Products, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (On Behalf of Plaintiff and All Class Members)

139.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

140.    Defendants concealed and failed to disclose on the Products' packaging and labeling the material fact the Products contained or risked containing PFAS, and that the Products were not safe or healthy for use.

141.    As discussed at great length above, it has been known since the 1950's that PFAS are harmful chemicals to humans, animals, and the environment.  The EPA, CDC and many other groups and publications have further reported on the potential risks and dangers of PFAS.

this known fact is detrimental to the consumer.

142.   Defendants have a duty to disclose that the Products contained or risked containing PFAS; however, Defendants did not make this disclosure.

143.   Plaintiff and the Class all paid a premium for the Products based upon the way it was represented, which did not include the inclusion of PFAS, and products that are tainted with PFAS are not worth a premium to a reasonable consumer.

144.   Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiff and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their Products.   Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

145.   Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.   Consumers such as Plaintiff and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.   Defendants knows that if it had not omitted that the Products contained or risked containing PFAS, then Plaintiff and the Class would not have agreed to pay a premium price for the Products, or wouldn't have purchased the Products at all; however, Defendants wanted to increase sales and profits.

146.   Defendants' concealment misled Plaintiff and the Class as to the true nature of what they were buying and putting onto and into their bodies.

147.   Defendants fraudulently concealed that the Products contained or risked containing PFAS.   Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members in the Alternative)

148.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149.  Plaintiff, on behalf of herself and consumers nationwide, bring a claim for unjust enrichment.

150.  Defendants' conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

151.  Defendants' unlawful conduct, as described in this Complaint, allowed Defendants to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

152.  Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Products, which were not as Defendants represented them to be.

153.  It is inequitable for Defendants to retain the benefits conferred by Plaintiff and Class Members' overpayments.

154.  Plaintiff and Class Members seek establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demand a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, pray for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as representative of the Class under Rule 23 of the FRCP;

(b) Awarding monetary damages and treble damages;

(c) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(d) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(e) Awarding punitive damages;

(f) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: July 7, 2022

**THE SULTZER LAW GROUP P.C.**

By:     Jason P. Sultzer /s/
_____
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

*Counsel for Plaintiff and the Class*